## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Aug 13 2018, 7:48 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT S.S.

Leanna Weissmann
Lawrenceburg, Indiana

ATTORNEY FOR APPELLANT K.M.

Jennifer A. Joas
Madison, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Katherine A. Cornelius
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

In the Matter of the Involuntary Termination of the Parent-Child Relationship of E.S. and G.S. (Minor Children) and

S.S. (Mother) and K.M. (Father),

*Appellants-Respondents,*

v.

The Indiana Department of Child Services,

*Appellee-Petitioner*

August 13, 2018

Court of Appeals Case No. 18A-JT-196

Appeal from the Dearborn Circuit Court

The Honorable James D. Humphrey, Judge

Trial Court Cause Nos. 15C01-1705-JT-6, -7

**Crone, Judge.**

## Case Summary

S.S. ('Mother') and K.M. ("Father") (collectively "the Parents") appeal the trial court's order involuntarily terminating their parental rights to their minor children E.S. and G.S. (collectively "the Children"). We affirm.

## Facts and Procedural History

The Parents are the biological parents of E.S., born on November 3, 2013, and G.S., born on January 30, 2015. The Dearborn County Department of Child Services ("DCS") became involved with this family in June 2015 due to unsanitary home conditions and lack of supervision of the Children. After a program of informal adjustment was attempted but ultimately unsuccessful, DCS filed a petition alleging that the Children were children in need of services ("CHINS"), and the Children were removed from the Parents' care. A petition to terminate parental rights was subsequently filed on May 22, 2017, and following evidentiary hearings held on July 27, August 18, October 19, November 2, and November 22, 2017, the trial court made the following relevant findings of fact:[1]

> e. On May 2, 2016, DCS removed the Children from their parents' care due to Mother's inability to apply services to properly supervise the Children. Specifically, the Children had gotten out of Mother's apartment on two occasions, and DCS and service providers had serious concerns with Mother's ability

---

[1] The trial court sometimes refers to the parties by their full names. We use the aforementioned designations where appropriate.

to supervise the Children.

f. As part of the dispositional decree, the Parents were required to complete individual counseling through Community Mental Health Center (hereinafter "CMHC"), complete homemaker services, improve their parenting skills, secure and maintain suitable and safe housing, refrain from breaking the law, and show the ability to supervise and parent two young children.

g. Family Case Manager Gretchen Ricketts testified that she met with both parents and created goals for them to aspire to, including financial stability, improved supervision, and sanitary home conditions, none of which were fully achieved.

h. Family Case Manager [("FCM")] Crystal Turner worked with the family beginning in July 2016, and testified that no progress was made while she was the case manager. At times during the pendency of the case home conditions were described as deplorable – bed bugs, animal feces and stale food left about the house.

i. In February 2016, Father was charged with possession of a narcotic drug, possession of paraphernalia, and theft…. Father pleaded guilty to possession of a narcotic drug and theft in May 2016 and was placed on probation until May 2018. In March 2017, Father violated his probation by testing positive for marijuana on three occasions.

j. Father is currently incarcerated for violating his probation, by testing positive for Methamphetamine and Amphetamine on September 15, 2017 and September 18, 2017.

….

l. [Mother's therapist] testified that while Mother has made some progress throughout the years, she would have concerns for the Children's safety if they were returned to Mother's care …

includ[ing] a lack of a support system for Mother, Mother's limited financial resources, and the inability of Mother to apply learned skills, such as keeping the house sanitary and safe for children.

....

n. [Gayle Holten from CMHC] testified that she would have concerns for the Children's safety if they were returned to Mother's care. Specifically, Ms. Holten's concerns included Mother's inability to apply learned skills consistently and Mother's inability to follow-through with expectations and application. For example, Ms. Holten testified that during numerous visits to Mother's home, she pointed out choking hazards that Mother immediately addressed. However, the choking hazards would return the following week.

o. Sophia Frazier ... supervised visits with the Parents from September 2016 to June 2017.... During the visits in Mother's home, Ms. Frazier testified that she consistently experienced issues with the cleanliness of the home, as well as hazardous materials within reach of the Children. Examples of the hazardous materials include: an electric drill within reach of the Children, a hair dryer next to standing water, safety razors within reach of the Children, stacked boxes, and uncovered electrical outlets when at least one of the Children attempted to put a key in an electrical outlet. Ms. Frazier further testified that Mother addressed the issues when mentioned, but the same issues would appear the following week.

p. Mother has not been employed throughout the underlying CHINS cases and remains unemployed today. She has applied for disability on three occasions and has been denied all three times. She has been supporting herself with food stamps and family support. Mother did receive financial aid for two (2) semesters while enrolled at Ivy Tech. Mother quickly spent all of that aid on clothes for the Children, child care items, a television,

a gaming console, an iPad, a laptop, and food.  Mother was also employed for four (4) days at the local Dunkin' Donuts after DCS filed for termination of parental rights, but was fired for her inability to apply the skills she had been taught.

....

r.  Throughout the underlying CHINS cases, Father was offered supervised visitation, individual counseling, homemaker services, and random drug screens.  Father rarely appeared for supervised visitation and only did so toward the end of the CHINS case, when he was on house arrest and had to remain in the home. Father did not go to individual counseling or work with a homemaker.  Father also did not comply with random drug screens; Father did not call the DCS office for drug screening purposes, because of his social anxiety.

s.  Father's counsel submitted Father's 2017 Counseling Report, without objection.  The counseling report indicates that Father participated in homemaker services in early 2017, despite being ordered to complete the service in the Dispositional Decree.  The report also indicates that Father is currently attending services, but is largely due to Father's current incarceration.  Testimony also indicated that Father has a history of non-compliance. Father also failed to take steps to establish paternity.

In addition, the Parents had to be constantly reminded to refrain from the use of electronic devices during visitation with the Children.  Dangers to the Children caused by the Parent[s'] lack of ability to supervise is represented by the Children fleeing from the home while they were supposed to be supervised by [the] Parents and the need for service providers and caseworkers to intervene during visits for the Children's safety.

Appealed Order at 2-5 (citations omitted).

[3] Based upon these findings of fact, the trial court concluded that: (1) there is a reasonable probability that the conditions that resulted in the Children's removal and continued placement outside the home will not be remedied by either parent; (2) there is a reasonable probability that the continuation of the parent-child relationship between both parents and the Children poses a threat to the Children's well-being; (3) termination of the parent-child relationship between both parents and the Children is in the Children's best interests; and (4) DCS has a satisfactory plan for the care and treatment of the Children, which is adoption. Accordingly, the trial court determined that DCS had proven the allegations of the petition to terminate parental rights by clear and convincing evidence and therefore terminated both parents' rights to the Children. Each parent now appeals.

## Discussion and Decision

[4] "The purpose of terminating parental rights is not to punish the parents but, instead, to protect their children. Thus, although parental rights are of a constitutional dimension, the law provides for the termination of these rights when the parents are unable or unwilling to meet their parental responsibilities." *In re A.P.*, 882 N.E.2d 799, 805 (Ind. Ct. App. 2008) (citation omitted). "[T]ermination is intended as a last resort, available only when all other reasonable efforts have failed." *Id*. A petition for the involuntary termination of parental rights must allege in pertinent part:

(B) that one (1) of the following is true:

(i) There is a reasonable probability that the conditions that resulted in the child's removal or the reasons for placement outside the home of the parents will not be remedied.

(ii) There is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the child.

(iii) The child has, on two (2) separate occasions, been adjudicated a child in need of services;

(C) that termination is in the best interests of the child; and

(D) that there is a satisfactory plan for the care and treatment of the child.

Ind. Code § 31-35-2-4(b)(2).  DCS must prove that termination is appropriate by a showing of clear and convincing evidence.  *In re V.A.*, 51 N.E.3d 1140, 1144 (Ind. 2016).  If the trial court finds that the allegations in a petition are true, the court shall terminate the parent-child relationship.  Ind. Code § 31-35-2-8(a).

[5] "We have long had a highly deferential standard of review in cases involving the termination of parental rights."  *C.A. v. Ind. Dep't of Child Servs.*, 15 N.E.3d 85, 92 (Ind. Ct. App. 2014).

> We neither reweigh evidence nor assess witness credibility.  We consider only the evidence and reasonable inferences favorable to the trial court's judgment.  Where the trial court enters findings of fact and conclusions thereon, we apply a two-tiered standard of review:  we first determine whether the evidence supports the findings and then determine whether the findings support the judgment.  In deference to the trial court's unique position to

assess the evidence, we will set aside a judgment terminating a parent-child relationship only if it is clearly erroneous.

*Id.* at 92-93 (citations omitted). "A judgment is clearly erroneous if the findings do not support the trial court's conclusions or the conclusions do not support the judgment." *In re R.J.*, 829 N.E.2d 1032, 1035 (Ind. Ct. App. 2005).

[6] Both Mother and Father challenge the sufficiency of the evidence supporting the trial court's conclusion that there is a reasonable probability that the conditions that resulted in the Children's removal from and continued placement outside the home will not be remedied,[2] and that termination of their respective parental rights is in the Children's best interests.

## Section 1 – Clear and convincing evidence supports the trial court's conclusion that there is a reasonable probability of unchanged conditions.

[7] Mother and Father each assert that DCS failed to present clear and convincing evidence that there is a reasonable probability that the conditions that led to the Children's removal and continued placement outside the home will not be

---

[2] Both Mother and Father also argue that DCS failed to prove that there is a reasonable probability that the continuation of the parent-child relationship poses a threat to the well-being of the Children. However, Indiana Code Section 31-35-2-4(b)(2)(B) is written in the disjunctive, such that, to properly effectuate the termination of parental rights, the trial court need only find that one of the three requirements of that subsection has been established by clear and convincing evidence. *A.D.S. v. Ind. Dep't of Child Servs.*, 987 N.E.2d 1150, 1156 (Ind. Ct. App. 2013), *trans. denied*. Accordingly, we will address the sufficiency of the evidence regarding only one of the three requirements.

remedied.[3] In determining whether there is a reasonable probability that the conditions that led to the Children's removal and continued placement outside the home will not be remedied, we engage in a two-step analysis. *K.T.K. v. Ind. Dep't of Child Servs.*, 989 N.E.2d 1225, 1231 (Ind. 2013). First, "we must ascertain what conditions led to their placement and retention in foster care." *Id.* Second, "we 'determine whether there is a reasonable probability that those conditions will not be remedied.'" *Id.* (quoting *In re I.A.*, 934 N.E.2d 1132, 1134 (Ind. 2010) (citing *In re A.A.C.*, 682 N.E.2d 542, 544 (Ind. Ct. App. 1997))). In the second step, the trial court must judge a parent's fitness at the time of the termination proceeding, taking into consideration evidence of changed conditions, and balancing a parent's recent improvements against "'habitual pattern[s] of conduct to determine whether there is a substantial probability of future neglect or deprivation.'" *In re E.M.*, 4 N.E.3d 636, 643 (Ind. 2014) (quoting *K.T.K.*, 989 N.E.2d at 1231). "A pattern of unwillingness to deal with parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, support a finding that there exists no reasonable probability that the conditions will change." *Lang v. Starke Cty. Office of Family & Children*, 861 N.E.2d 366, 372 (Ind. Ct. App. 2007), *trans. denied*. The evidence presented by DCS "need not rule out all possibilities of change; rather, DCS need establish only that there is a reasonable probability

---

[3] Mother and Father each challenge some of the trial court's individual findings of fact or portions of certain findings of fact, but we need not address these challenges because we can resolve the issues presented based on the unchallenged findings and the evidence underlying those findings.

that the parent's behavior will not change." *In re Kay L.*, 867 N.E.2d 236, 242 (Ind. Ct. App. 2007).

[8]     Here, there is sufficient evidence in the record to support the trial court's findings and ultimate conclusion that there is a reasonable probability that the conditions that led to the Children's removal and continued placement outside the Parents' care will not be remedied by either Mother or Father. The Children were initially removed from the home due to the deplorable conditions as well as lack of appropriate supervision of the Children. The Children continued to be placed outside the home because neither parent seemed to progress in his or her ability to provide a clean, safe, and stable home. As for Mother, she asserts that as of the date of the final termination hearing, she presented evidence that her living conditions are no longer deplorable and that she can adequately supervise the Children because, as of June 2017, she has found the right medications to deal with the mental health issues that had caused her to be distracted and overwhelmed. Thus, she asserts, "conditions have been remedied." Mother's Br. at 20. While we commend Mother's recent efforts and improvements, we must defer to the trial court's assessment of the testimony of service providers that Mother's parenting skills have not substantially improved and are unlikely to ever do so. Mother has consistently demonstrated an inability to maintain a safe, clean, and stable home for the Children.

[9]     Mother admits that while the evidence may support a finding that perhaps the Children should not immediately return to her care, the evidence does not

support termination of her rights and the trial court should have simply continued the CHINS proceedings to give her more time. However, DCS has been involved with this family and has been trying to help Mother learn how to parent for almost two years. The trial court was under no obligation to wait even longer to see if Mother would progress, and we will not second-guess that decision. "[C]hildren have an interest in terminating parental rights that prevent adoption and inhibit establishing secure, stable, long-term, continuous relationships." *K.T.K.*, 989 N.E.2d at 1230 (quoting *In re C.G.*, 954 N.E.2d 910, 917 (Ind. 2011)). There is sufficient evidence in the record to support the trial court's conclusion that there is a reasonable probability that the conditions that led to the Children's removal and continued placement outside of the Parents' care will not be remedied by Mother.

[10] As for Father, he blames the reasons for the Children's initial removal wholly on Mother because he did not reside with Mother and the Children at the time. While we do review the changes in the conditions under which Children were removed from a parent's care, we also consider "those bases resulting in continued placement outside the home." *In re A.I.*, 825 N.E.2d 798, 806 (Ind. Ct. App. 2005), *trans. denied*. Even assuming Father was not responsible for the initial removal of the Children, he has done little to remedy the conditions that resulted in their continued placement outside the home. Father was incarcerated at various times throughout the case, and the record indicates that Father did not actively participate in services when he was not incarcerated. Indeed, our review of the record reveals that except for times when Father was

on house arrest or incarcerated, he did not comply with services, did not consistently attend supervised visitation, continued to use drugs, and was unable to secure employment or stable housing. Father concedes that he was noncompliant, but he asserts he has recently demonstrated "an effort towards remedying the reasons for placement outside the home." Father's Br. at 23. As found by the trial court, Father's recent efforts are largely due to his current incarceration. Father's pattern of unwillingness to deal with his parenting problems and to cooperate with those providing social services, in conjunction with unchanged conditions, supports the trial court's conclusion that there exists no reasonable probability that Father will remedy the conditions.

[11] In sum, the trial court was tasked with balancing the Parents' recent improvements against their habitual patterns of conduct to determine whether there is a substantial probability of future neglect or deprivation. It is not our prerogative on appeal to reweigh the evidence or reassess witness credibility. Clear and convincing evidence supports the trial court's conclusion that there is a reasonable probability that the conditions that led to the Children's removal and continued placement outside the home will not be remedied by either Mother or Father.

## Section 2 – Clear and convincing evidence supports the trial court's conclusion that termination of both Mother's and Father's parental rights is in the Children's best interests.

[12] Both Parents assert that DCS failed to present clear and convincing evidence to support the trial court's conclusion that termination of their respective parental

rights is in the Children's best interests. In considering whether termination of parental rights is in the best interests of a child, the trial court is required to look beyond the factors identified by DCS and look to the totality of the evidence. *McBride v. Monroe Cty. Office of Family & Children*, 798 N.E.2d 185, 203 (Ind. Ct. App. 2003). In doing so, the trial court must subordinate the interests of the parent to those of the child involved. *Id*. The trial court need not wait until the child is irreversibly harmed before terminating parental rights. *Id*. "The historic inability to provide adequate housing, stability, and supervision, coupled with the current inability to provide the same, will support a finding that continuation of the parent-child relationship is contrary to the child's best interests." *In re A.H.*, 832 N.E.2d 563, 570 (Ind. Ct. App. 2005). The testimony of service providers may support a finding that termination is in the child's best interests. *McBride,* 798 N.E.2d at 203.

[13] Here, FCM Turner testified that none of the conditions that led to the Children's initial removal from the home have been remedied by either Mother or Father, and she opined that termination of both Parents' rights was in the Children's best interests. Regarding Mother, Turner testified that she remained unable to appropriately supervise the Children or provide a safe home environment, and that after more than two years of parenting classes, she "is unable to apply anything that she's learned." Tr. Vol. 1 at 116. Turner further noted that Mother has no financial means to support the Children and no transportation. Regarding Father, Turner testified that he has not engaged in services throughout the entire pendency of the case, has failed to consistently

attend visits, has not been employed, and "really has a basic not-caring attitude about what his children need." *Id*. at 117. Turner noted that E.S. has been diagnosed with reactive attachment disorder and displays behaviors consistent with autism spectrum disorder, and that the Parents are ill-equipped to handle the challenges of dealing with these issues.

[14] Similarly, therapist Sarah Wickman testified that she would be concerned for the Children's safety if they were returned to the home due to Mother's continuing struggle with becoming easily overwhelmed and her inability to apply what she has been taught. She also stated that Mother's limited financial resources and lack of employment posed a threat to Mother's ability to care for the Children. As for Father, Wickman noted that Father seemed unable to focus around the Children and needed constant coaching regarding proper interactions, and the Children sometimes avoided Father during visits.

[15] Finally, service provider and parenting educator Gayle Holten testified that she was tasked with teaching the Parents how to create a clean and safe environment for the Children. Mother inconsistently participated in these services and, even after being taught skills, demonstrated an inability to apply them. Holten stated that Mother was unable to focus on the needs of the Children as opposed to her own needs. As for Father, he rarely participated in services and, during one home visit, he played video games and refused to engage in services.

[16] The evidence of unchanged conditions coupled with the testimony of service providers supports the trial court's conclusion that termination of both Parents' rights is in the Children's best interests. "Clear and convincing evidence need not reveal that the continued custody of the parents is wholly inadequate for the child's very survival. Rather, it is sufficient to show by clear and convincing evidence that the child's emotional and physical development are threatened by the respondent parent's custody." *Bester v. Lake Cnty. Office of Family & Children*, 839 N.E.2d 143, 148 (citation and quotation marks omitted). The Parents have been given ample time to demonstrate an ability to properly care for these young children and they have failed to do so. The Children need the safety and stability that adoption can provide them. Accordingly, we affirm the trial court's termination of both Mother's and Father's parental rights.

[17] Affirmed.

Najam, J., and Pyle, J., concur.